**UNITED STATES of America**

v.

**John S. CARPENTER.**

**Crim. A. No. CR81–331A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

June 18, 1985.

---

Michael Abbott, Janet King, Asst. U.S. Attys., Atlanta, Ga., for plaintiff.

John Martin, Atlanta, Ga., for defendant.

## MEMORANDUM OPINION AND ORDER

HORACE T. WARD, District Judge.

Defendant John S. Carpenter is charged, along with others in the above indictment, with conspiring to violate the laws of the United States of America in unlawfully importing into the United States from outside the customs territory a quantity of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 952(a) and § 963. Among the pretrial motions filed by defendant Carpenter were a motion to dismiss the indictment and a motion to suppress the use of certain evidence by the government. Both motions are based upon defendant's contention that his Fifth Amendment rights were violated by the use of information obtained from him following an agreement not to use such information and an informal grant of immunity to him by federal agents. Evidentiary hearings on the motions were held before Magistrate Dougherty on May 24, 1982, June 2, 1982, June 3, 1982 and August 17, 1982. Because a determination of the two motions required a knowledge of the evidence to be used by the prosecution at the time of trial, it was agreed by the parties that the motions would be deferred until the conclusion of the trial. A jury returned a guilty verdict as to defendant Carpenter, and thus a determination on the motions is necessary.

Subsequent to the verdict of guilty an additional hearing was held before Magistrate Dougherty on May 27, 1983, for the limited purpose of allowing the government to introduce any additional evidence as to an independent source of evidence used in the indictment and trial of the defendant. On June 7, 1984, Magistrate Dougherty issued his Report and Recommendation, in which he recommended that both motions be denied. Thereafter, the defendant filed his objections to the Magistrate's Report and Recommendation. The government responded to defendant's arguments, urging the court to approve the magistrate's conclusions and deny defendant's motions.

Since both motions rely upon similar facts and legal theories, they will be addressed together in this opinion and order.

## BACKGROUND

Prior to and during the spring of 1979 a task force was operating out of the United States Attorney's Office in East St. Louis, Illinois for the purpose of investigating a large number of persons suspected of importing and distributing marijuana into and within the United States and organized in a loose knit group known as the "Company." United States Attorneys, members of the United States Drug Enforcement Agency (DEA), and officers of state investigative agencies where suspects were found contributed to this task force. Special Agents William H. Sheppard and Gregg Owens of the Georgia Bureau of Investigation (GBI) were involved in the activities of this Task Force.

While the investigation of the Company was going forward, another investigation was being carried out by the Georgia Bureau of Investigation of a group suspected of drug smuggling known as the "Tech Motel" group. GBI Agent Owens was in charge of this investigation and his group had learned that Bob Morgan, Hubert Cotton and others used the Tech Motel, an Atlanta motel, as their base of operation for the purpose of smuggling drugs into the country. Defendant Carpenter was known by the GBI to be associated with the Tech Motel group only on the basis of his representation of Morgan and Cotton as their attorney in the past.

In late May, 1979 several thousand pounds of marijuana were discovered in a warehouse in Clayton County, Georgia, and several arrests were made. Among those arrested were Richard Thorpe and Michael Grassi, known to be "officers" in the Company, and another Company member known as Dick Larson. The federal Task Force in East St. Louis was advised of the arrests in Clayton County and of the persons involved. Carpenter subsequently represented Grassi in the criminal action brought in Clayton County. The first

knowledge of any connection between the Tech Motel group and the Company gained by government agents was in the summer of 1979 when it was learned that Carpenter was representing those members of the Company arrested at the Clayton County warehouse.

During the fall and winter of 1979 the investigations of the Company and the Tech Motel group continued and pretrial motions were considered in the Clayton County action pending against those members of the Company who were charged in that indictment. Toward the end of 1979 the GBI learned from an informant that members of the Company and the Tech Motel group had previously attempted to put "deals" together and had in fact completed one deal. The informant stated that an amount of money approaching $1 million was missing but the money was later returned by Pat Hinton, the common-law wife of Cotton. A subsequent witness, Billy Kinney, in January 1980, advised the GBI of a drug flight that landed in North Carolina in November 1979. He advised that Cotton, a Tech Motel principal, and Thorpe, a Company principal, were involved in this drug flight and deal. After a check with the North Carolina Bureau of Investigation, the Georgia agents determined that the field upon which that November 1979 drug flight had landed was in all probability an airstrip owned by Billy Flowers. Prior to the attempt by defendant Carpenter to provide information to government agents, they had learned from several sources of the North Carolina drug flight in November 1979 and of the location of the air field. Prior to receiving any information from Carpenter, the government agents received information in January 1980 from Bob Day, a former pilot for the Tech Motel group. Day also advised the agents of the drug deal to North Carolina, the use of a DC–6 airplane, and the loss of a large sum of money from the deal and the subsequent return of that money by Pat Hinton (Mr. Cotton's wife). Day was aware that defendant Carpenter was present at the Tech Motel during the trip. He was further aware that Antigua was a staging area for the Company and that Vere Bird, Sr. and Jr. were influential on the Island and that Carpenter had contacts with them.

On February 1, 1980 Carpenter was arrested and charged in Clayton County with attempted bribery of a government official in connection with the action pending against the members of the Company in Clayton County Superior Court. Following an initial approach by GBI agents and some two to three weeks later, on February 19, 1980, Carpenter indicated to these agents that he wished to cooperate and in exchange wished to have the bribery case against him dismissed so as to prevent his disbarment as an attorney at law. The agents indicated that they could not make such an agreement with him but that if he gave them any valuable information that fact would be made known to the state district attorney prosecuting Carpenter's case. Carpenter did provide information to GBI Agents Owen and Sheppard primarily concerning a proposed future drug transaction planned jointly by the Company and the Tech Motel group. This information was furnished during the end of February and through March 16, 1980. Based upon Carpenter's agreement to assist the GBI in obtaining evidence against the principals in this prospective drug deal, Cotton and Thorpe, Carpenter was provided with airplane fuel which was transported to North Carolina under surveillance by the GBI. The transaction at that time was called off. Later information furnished by Carpenter to the GBI concerned a proposed drug flight into Carrollton, Georgia which never materialized. At that time, the GBI agents determined that Carpenter had not furnished sufficient information to warrant further discussions with him.

During this one-month period in which Carpenter was furnishing information to the Georgia agents, the unwritten agreement between Carpenter and those agents was that the agents would advise the district attorney of Clayton County of Carpenter's cooperation and that none of the material which Carpenter furnished with re-

gard to on-going and future drug transactions would be used against him. During these conversations with the GBI agents, Carpenter never specifically identified the landing strip in North Carolina nor did he ever admit any involvement in the November 1979 drug flight into North Carolina or in any previous drug operations.

In March 1980, Carpenter went to St. Louis for the purpose of meeting with federal and state agents investigating the Company. GBI Agent Sheppard went along for the purpose of introducing Carpenter to DEA agents. A purpose of Carpenter's visit to the DEA Task Force was to offer the cooperation of his client Grassi and his own cooperation in order to avoid possible federal prosecution. At the time of this visit to the federal agents, they were aware that Carpenter had represented Grassi in the past but were not willing to receive information on behalf of Grassi without a waiver of attorney-client privilege by Grassi. During this short meeting, Carpenter proffered some information to the agents including information concerning assets of members of the Company which might be available to the federal agents for seizure. Carpenter also advised the agents that he was aware of a drug flight into North Carolina in 1979 and that the pilot of the flight was Ike Battern.

Some three days later Carpenter returned to East St. Louis and presented a written waiver from Grassi to Assistant United States Attorney Proud. Inasmuch as there still remained a question as to the attorney who represented Grassi, Proud was reluctant to enter into further discussions with Carpenter at that point in time. The gist of the conversations between agents and Carpenter on March 20 indicated that the agents were primarily interested in learning of assets of the Company which might be subject to governmental seizure and were not interested in obtaining evidence to incriminate Carpenter. Carpenter was advised by AUSA Proud on March 20 that they would be in contact with him should they desire to receive any further information which he might have concerning the operations of the Company.

On April 2, 1980, at the instigation and expense of the United States government, Carpenter returned to East St. Louis for a further conversation with AUSA Proud and Agents Moriarty and Irving. At this meeting, it appears that Carpenter was attempting to obtain immunity for himself; he was not representing Grassi. Carpenter's proffer to the agents was primarily concerned with information about assets of the Company, information which was particularly interesting to the DEA Task Force. Because of their desire to learn the location of Company assets, the Task Force determined to confer "desk" immunity upon Carpenter for whatever information he had.

A formal agreement was prepared and executed on April 2, 1980 between Carpenter and the United States Attorney for the Southern District of Illinois which was executed by Carpenter and by AUSA Clifford J. Proud. Paragraph two of this agreement dated April 2, 1980 provided as follows:

2. John S. Carpenter agrees to voluntarily appear before the Federal grand jury for the Southern District of Illinois to testify fully and completely as to any knowledge he has concerning violations of the United States Code in the Southern District of Illinois and elsewhere. It is further agreed between the United States of America and John S. Carpenter that this Agreement will provide John S. Carpenter the extent of protection that would be afforded John S. Carpenter if the United States of America had applied to the United States District Court for an Order Compelling Testimony under Title 18, United States Code, Sections 6001–6005 and, as stated in Title 18, United States Code, Section 6002, no testimony or other information provided by John S. Carpenter under this Agreement (or any information directly or indirectly derived from such testimony or other information) may be used against John S. Carpenter in any criminal case except a prosecution for perjury, giving a false state-

ment, or otherwise failing to comply with this Agreement.

AUSA Proud did not comply with those procedures set out in 18 U.S.C. §§ 6001–6005 to obtain statutory immunity and the Justice Department of the United States did not grant authority for AUSA Proud to enter into this agreement. Proud testified before the Magistrate that it was his belief that he had not conferred statutory immunity upon Carpenter but that he had conferred an equitable or informal immunity for the information which Carpenter was to provide him following the execution of the agreement.

Following his "immunization" Carpenter told the agents of seizure of a Company plane in Greenville, Tennessee. He further advised them that money had been sent to Vere Bird in Antigua in order to have records relating to the Tennessee flight destroyed. Carpenter stated that Vere Bird was paid for his cooperation with the smugglers and received a total of $125,000. Carpenter provided specific information as to the means and methods he had used to obtain bonds and to release cash funds in Louisiana and South Carolina. He indicated to the federal agents that he believed that he could obtain some $300,000 from the Company assets which was pledged on bonds in South Carolina. The notes of DEA Agent Moriarty do not reflect that Carpenter, following his immunization, made any reference to the alleged disappearance and recovery of some $800,000 following a drug transaction. Carpenter's alleged information failed to arouse the interest of the federal agents who later characterized the information as "garbage" and the source of the information, defendant Carpenter, as "full of baloney." Carpenter was never required or asked to testify before any petit or grand jury relating to this information. The information was neither recorded on an official DEA form nor was the information reduced to an investigative report. Also, the record does not show that prior to the indictment, the East St. Louis Task Force ever released the substance of any information received from Carpenter to any state or federal agency.

Prior to the DEA Task Force interview of Carpenter, Richard Dick Larson was indicted in the Southern District of Illinois in November 1979. Larson subsequently entered into a plea bargain with the federal prosecutors and during his cooperation with the government gave them a statement on May 12, 1980. Larson informed the government that there had been a flight into North Carolina in November 1979 and further that there was an incident involving a loss of some $800,000 and that Carpenter had been involved in a payoff of the officials in Antigua. The East St. Louis Task Force sent a transcript of Larson's statement to the GBI agents in Georgia along with names of other cooperating convicted defendants who might have some information of interest to the Georgia agents. Larson was subsequently brought to Atlanta in June 1980 where he was interviewed by GBI agent at the Coweta County Jail and provided further detailed information concerning the November 1979 flight into North Carolina and Carpenter's participation in that flight. Among those names furnished to the GBI by East St. Louis was that of Ken Davidson, who was also implicated in the statement of Larson. Davidson was also interviewed by GBI agents and provided further information concerning Carpenter's role in the North Carolina flight.

On May 23, 1980 Carpenter again flew to East St. Louis and at the request of federal agents agreed to execute certain documents so that certain Company funds placed as collateral for security bonds would be available to the government. Carpenter testified that it was because of · his efforts that Grassi, Larson, Davidson and James Kincaid ultimately began to cooperate with the government and later testified against him at the time of trial. The court is unable to accept this testimony as conclusive since the agents were aware of these persons and their activities from sources other than Carpenter. However, it has been shown that certain of Carpenter's immunized statements were known to the prosecutor in the above-styled action and

may have played some role in his preparation of the case against defendant Carpenter.

In an affidavit submitted as part of the evidence before the magistrate, trial prosecutor Michael Abbott stated that during pretrial preparations he interviewed Davidson, Larson and Kincaid, and discovered that all had been bonded out of jail by Carpenter, and that they did not consider him their attorney. Mr. Abbott further stated that prior to interviewing these three witnesses, he was aware that Carpenter had been given use immunity for certain information that he had given to the Department of Justice authorities in East St. Louis. He further stated that only through these interviews did he learn of the connection between the posting of bonds by Carpenter for the three named men and the subject matter of the conspiracy. Mr. Abbott was assigned to prosecute the trial of the case in the spring of 1982 (April or May), and conducted the interviews thereafter. Prior to the appearance of Mr. Abbott, the government was represented by Assistant United States Attorney Janet F. King.

## DISCUSSION

■ The privilege against self-incrimination afforded by the Fifth Amendment to the Constitution of the United States is broad; "it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). The breadth of the Fifth Amendment privilege and of the correlative guarantees contained in most state constitutions has led to a proliferation of immunity statutes. *Id.* at 447, 92 S.Ct. at 1657–1658. As a constitutional minimum, the government must confer so-called "use and derivative use immunity" when compelling otherwise privileged testimony pursuant to a grant of immunity[1]. Use and derivative use immunity means that

the prosecutor may not use the compelled (immunized) testimony as evidence or as an investigative lead. The prosecuting attorney may not even use any evidence obtained by focusing investigation on a witness under a grant of compelled disclosures. Indeed, once a person testifies under a grant of use immunity, if the person is later prosecuted, the government bears the burden of showing its evidence is not tainted, by establishing that it had an independent, legitimate source for the evidence objected to.

R. McNamara, *Constitutional Limitations on Criminal Procedure* § 13.12, at 210–11 (1982) (footnotes citing *Kastigar* omitted). In this way, the privilege against self-incrimination is supplanted by a grant of immunity which is coextensive with the privilege; thus, use and derivative use immunity leaves both the government and the witness in the same position as if the witness had claimed the privilege. *Kastigar,* 406 U.S. at 458–59, 92 S.Ct. at 1663–1664.

■ The decision to confer witness immunity in the federal courts is for the executive branch and not the judiciary. *See, e.g., United States v. D'Apice,* 664 F.2d 75, 77 (5th Cir.1981). Pursuant to the federal use immunity provisions, 18 U.S.C. §§ 6001–6005, a formal grant of testimonial immunity in the federal system can only be made by the Attorney General of the United States, with approval of court, pursuant to express statutory authorization. However, the courts have developed a concept of "nonstatutory" immunity whereby the courts will enforce informal or procedurally flawed grants of immunity on equitable grounds. *See, e.g., Rowe v. Griffin,* 676 F.2d 524 (11th Cir.1982); *United States v. Weiss,* 599 F.2d 730 (5th Cir.1979); *United States v. Calimano,* 576 F.2d 637 (5th Cir.1978); *United States v. Sanderson,* 498 F.Supp. 273 (M.D.Fla.1980). *See*

---

1. Of course, the government may go further and grant what is known as "transactional immunity." However, in *Kastigar,* the Court held that use and derivative use immunity is all that the Constitution would require. Transactional immunity is not involved in the instant case; if any immunity is involved, it is clearly something other than transactional immunity.

*also, United States v. D'Apice,* 664 F.2d at 78 n. 6 (5th Cir.1981). These cases indicate that where the government has entered into an agreement with a prospective defendant and the defendant has acted to his detriment or prejudice in reliance upon the agreement, "as a matter of fair conduct, the government ought to be required to honor such an agreement." *Rowe,* 676 F.2d at 527. *Cf. Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (relied on by *Rowe* court; applying contractual analysis and holding that defendant who pleads guilty as a result of a plea bargaining agreement has a due process right to enforcement of the bargain).

### I. Were Any of Carpenter's Statements Immunized?

Defendant Carpenter spoke to government officials on three separate occasions relevant to the motions now before the court. First, he made certain disclosures to the GBI agents during the latter part of February and up to March 17, 1980. Next, Carpenter made proffers of evidence to federal agents in East St. Louis on March 17, 20, and April 2, 1980 prior to any formal written agreement with those agents. Finally, Carpenter again spoke to the federal laws enforcement officials on April 2, 1980 after a formal immunity agreement was executed by Carpenter and the federal agents on behalf of the government. The Magistrate concluded that, under *Rowe v. Griffin, supra,* only Carpenter's last statements were given pursuant to an equitable grant of immunity. This court concludes that the Magistrate applied the *Rowe* principles too narrowly.

■ When Carpenter agreed to talk with the GBI agents, the agents agreed in return that any information furnished by Carpenter "would not be used against him." Although reaffirmed on several occasions, the agreement was no more specific as to the precise nature of the immunity conferred upon Carpenter. In light of the promised immunity, Carpenter spoke to the GBI agents. Carpenter acted to his detriment by giving up his fifth amendment

right to remain silent and giving information which could be used as an investigatory lead against him, thereby cementing the agreement.

The same analysis holds true for the proffers of evidence to the federal agents in East St. Louis. When Carpenter spoke to these law enforcement officials, it was pursuant to an understanding similar to that applicable to his prior statements to the GBI—i.e., that what he said could not be used against him. Again, Carpenter acted to his detriment by giving up his fifth amendment right to remain silent and giving information which could be used as an investigatory lead against him, thereby binding the government to its agreement.

■ Finally, Carpenter's statements after the execution of a written (though unauthorized) immunity agreement were made under circumstances clearly warranting the application of *Rowe*'s equitable immunity principles. Carpenter agreed to and did make statements to the federal authorities which would otherwise have been privileged from disclosure by the fifth amendment in return for the government's promise that no information provided by Carpenter under the agreement or any information directly or indirectly derived from such other information would be used against him in any criminal case. As in *Rowe,* a bargain was struck and the defendant waived his constitutional rights in reliance on the terms of the agreement, thereby making it enforceable against the government.

### II. The "Standard of Review": What Did the Parties Agree To?

The chief dispute between Carpenter and the government goes to the issue of what standard this court should apply to evaluate the alleged governmental use of Carpenter's statements given pursuant to a grant of equitable immunity. As a starting point, the government asserts that Carpenter accepted something less than use and derivative use immunity, i.e., he was only protected against direct use of his state-

ments to state and federal law enforcement officials. The court does not agree.

▮▮ Looking to the specific agreements which the court is to enforce under the circumstances, it is obvious that the terms of the bargain are not without ambiguity. As to statements made following the written agreement with federal agents, it is clear that Carpenter was promised the same immunity that is conferred upon those who testify pursuant to a court order under 18 U.S.C. § 6002. This is use and derivative use immunity. *Kastigar v. United States, supra.* As to Carpenter's earlier statements, both to federal authorities as well as to state authorities, the analysis is slightly more difficult. The "understanding" (never written, but clearly mutual) was that no statement would be "used against" the defendant. In divining the terms of the government's promise of immunity, the court is guided by the principle that "any ambiguity over the terms of such a promise should be resolved in favor of the criminal defendant." *Rowe,* 676 F.2d at 526 n. 4. *See also United States v. Quatermain,* 613 F.2d 38, 46–47 (3rd Cir. 1980) (Aldisert, J., dissenting). Moreover, it is clear that any evidence of guilt induced by an equitable grant of immunity, although not compelled by court order as in the case of testimony given pursuant to the federal use immunity statute, is "coerced" testimony for fifth amendment purposes. *Rowe,* 676 F.2d at 527 (*citing Shotwell Manufacturing Co. v. United States,* 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963). Thus, Carpenter gave up a constitutional right not to be coerced to testify against himself and assisted the government. Since fifth amendment concerns are implicated by statements given pursuant to a grant of immunity, whether formal or informal, Carpenter should not be presumed to have done so for less than his constitutional entitlement, absent clear and convincing evidence to the contrary. *Cf. United States v. Quatermain,* 467 F.Supp. 782, 788 (E.D.Pa.1979), *rev'd on other grounds,* 613 F.2d 38 (3rd Cir.1980). Nothing in the record suggests that Carpenter knowingly gave up more in exchange for what he expected in return; therefore, the court concludes that the informal verbally-conveyed equitable immunity at issue was coextensive with Carpenter's fifth amendment privilege. It was therefore use and derivative use immunity. *Kastigar v. United States, supra.*

The magistrate concluded that where equitable immunity is granted, the burden is on the defendant to show that he has been prejudiced by any alleged breach of the immunity agreement. The government urges the court to use this standard in evaluating whether the evidence supporting the indictment and verdict was proper. The defendant argues that the *Kastigar* requirement (that the government's evidence must derive from sources wholly independent from the defendant's statements) is both appropriate and constitutionally mandated. The court has been unable to find any cases which discuss the government's evidentiary burden to show that it complied with an informal immunity agreement.[2]

▮▮ Where a criminal defendant has waived his fifth amendment privilege against self-incrimination in exchange for

---

**2.** In *United States v. Brimberry,* 744 F.2d 580, 585 n. 4 (7th Cir.1984), the government argued that the stringent *Kastigar* standard "is inapplicable where the defendant voluntarily enters into a plea agreement and where his statements thus are not compelled. The government contend[ed] that, when such a voluntary agreement has been entered, the government need only demonstrate that its evidence is not 'fruit of the poisonous tree,' a standard that may be satisfied by showing that the evidence inevitably would have been gained even without the defendant's statements." The Seventh Circuit noted the dispute but did not need to resolve it in the *Brimberry* case. This court notes that the fourth amendment "fruit of the poisonous tree" approach has been rejected in the context of immunized testimony. *See generally United States v. Kurzer,* 534 F.2d 511, 516–17 (2nd Cir.1976).

In *United States v. Deerfield Specialty Papers,* 501 F.Supp. 796, 802–03 (E.D.Pa.1980), the court appears to have concluded, without much discussion of the issue, that *Kastigar* is fully applicable where the defendant has spoken pursuant to an informal grant of immunity.

an enforceable promise of immunity which bars the use of such compelled testimony against the person testifying, the government has "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1665. There is no reason to impose any requirement that is less stringent than that set out in *Kastigar* simply because the grant of immunity herein at issue was informal and not pursuant to statute. It is inappropriate to require Carpenter to show that he has been "prejudiced" once he has given compelled testimony pursuant to an immunity agreement.

The government offers many arguments in an attempt to resist having to shoulder *Kastigar*'s heavy burden. None of these arguments are sufficient to convince the court to "waterdown" Carpenter's constitutional rights. The fact that Carpenter may have first approached the government officials seeking to strike some bargain does not make voluntary what would otherwise be compelled. Of course, the prosecution may now regret the fact that it entered into an immunity agreement with the defendant, but Carpenter did not force them to do so. Compare *United States v. McBride*, 571 F.Supp. 596 (S.D.Tex.1983) (government induced to contract with defendant by threats of violence). Drawing from *Santobello*'s contractual analysis approach, mutually binding promises were freely given in exchange for valid consideration. The government knew what it was doing and cannot now seek to limit the consequences of its actions.

The government also argues that to allow the agreements to be enforced under the *Kastigar* standard poses the danger that an isolated and uncontrolled subordinate would unnecessarily compromise the government's prosecution efforts. First, even if the government's fear is justified, it simply does not apply to this case. The federal attorneys in East St. Louis were not pursuing some secret investigation without the approval of their superiors. They were acting on behalf of the DEA

Task Force, which was assigned the job of ferreting out and dismantling what was then believed to be one of the largest marijuana smuggling rings in the country. Moreover, the agreement given to Carpenter was not an isolated, one-time event. The Task Force investigation had been conducted in large part by the use of virtually identical informal immunity agreements; this appears to be the *modis operandi* of the investigation. Finally, in safeguarding rights guaranteed by the fifth amendment, it is not appropriate for this court to absolve the government of the promises its representatives enter into by overlooking the actions of government agents in "coercing" information from private citizens. If the federal agents involved were acting beyond their authority and contrary to department regulations when they promised Carpenter immunity for his cooperation, then it is those individuals who should be punished, not Carpenter. As the Fourth Circuit has observed in a strikingly similar context:

> If there be fear that a United States Attorney may unreasonably bargain away the government's right and duty to prosecute, the solution lies in the administrative controls which the Attorney General of the United States may promulgate to regulate and control the conduct of cases by the United States Attorneys and their assistants. The solution does not lie in formalisms about the express, implied or apparent authority of one United States Attorney, or his representative, to bind another United States Attorney.... There is more at stake than just the liberty of this defendant. At stake is the honor of the government[,] public confidence in the fair administration of justice, and the efficient administration of justice in a federal scheme of government.

*United States v. Carter*, 454 F.2d 426, 428 (4th Cir.1972) (en banc). *See also Santobello v. New York*, 404 U.S. at 262, 92 S.Ct. at 499 ("[A]t this stage the prosecution is not in a good position to argue that its inadvertent breach of agreement is immaterial. The staff lawyers in a prosecutor's office have the burden of 'letting the left

hand know what the right hand is doing' or has done. That the breach of agreement was inadvertent does not lessen its impact.").

III. Was the Government's Evidence Against Carpenter Derived From Legitimate Sources, Wholly Independent of the Immunized Testimony?

While the government strongly argues that the *Kastigar* burden is not appropriate in this case, the government also asserts that it has carried its burden under *Kastigar* by proving that evidence used against Carpenter was obtained from sources wholly independent from the "immunized" information given by him. By immunized information, the government is referring only to any information given on April 2, 1980 after the agreement on immunity was executed. This court has already concluded hereinabove that this view of the immunity grant was far too narrow.

In order to put the matter in proper focus, it must be remembered that defendant Carpenter was charged with being a member of the conspiracy in which the members performed various roles. The closing argument of trial prosecutor Michael Abbott clearly outlined the government's position as to the role of Carpenter:

Let's talk about John Carpenter. I submit to you that John Carpenter played basically two roles. It is clear from the evidence, I submit, that he played a role with respect to the release of that plane in Antigua. The evidence is, I submit to you, that he did that in order that the smuggle could go forward.

I submit to you also that Mr. Carpenter was what in baseball you would call a utility man. He did what was necessary to be done. Whatever problem arose, if it fell within his province, he would take care of it.

Let's review the evidence. In June of 1979, Mr. Carpenter bonded out Mr. Larson from Clayton County Jail and then from DeKalb County Jail and then from Fulton County Jail. Mr. Larson pays him no money, Mr. Larson never met him before, Mr. Larson didn't ask him to do it. As a matter of fact, there was a question to Mr. Larson as to who represented Mr. Thorpe and he said Mr. Thorpe was represented by two other lawyers. I submit to you what the evidence shows is that overall Mr. Carpenter was working for Mr. Thorpe but not as an attorney.

. . . .

He wasn't being a lawyer when he made the statement to Davidson on the private plane flight back to Atlanta, and he wasn't playing the lawyer when he made his statement to Mr. Cotton that I read to you earlier, and he wasn't playing the lawyer when he had his meeting with Mr. Larson when he talked about the smuggle and how he could get the plane and how he could get it out for $105,000.00. He wasn't playing lawyer when he took the polygraph test or the stress—voice stress test and he wasn't playing lawyer when he observed Tony Williams take the hundred thousand dollars for the payoff.

In an affidavit offered in the hearing before the Magistrate, trial prosecutor Abbott stated that prior to interviewing Larson, Davidson and Kincaid in preparation for trial he was aware that Carpenter had been given use immunity in East St. Louis. The trial prosecutor further stated that he did not know for whom Carpenter had posted bonds or the connection between the posting of bonds for the three men until he interviewed Larson, Davidson and Kincaid.

The government's case against John Carpenter was built largely from the testimony of Larson, Davidson and Kincaid. Also, to a lesser extent from the testimony of Hubert Cotton, related to Carpenter, but this testimony standing alone would not have been sufficient to substain a conviction.

Defendant Carpenter does not seem to contend that the government made any direct use of the "immunized" information that he provided in East St. Louis. The government never introduced any testimony that Carpenter had made the particular statements given by him in East St. Louis. Accordingly, the only possible use that the

government could have made of the information was derivative use of the "immunized" information given by Carpenter.

There is some conflict between Carpenter and the government as to the details of the information actually provided by him. He testified before the magistrate that it was more than the agents admitted. The following appears clear. Carpenter specifically told the prosecutors that he had been involved in payoffs of Vere Bird in Antigua in obtaining the release of the airplane which flew the flight involved in this case, this being the primary involvement of Carpenter in the case, and also explained how he had paid Vere Bird to destroy records with regard to a previous flight which had been "busted." Carpenter also described in detail his efforts in obtaining bonds both in Louisiana and South Carolina. None of this information was fully known by the government prior to Carpenter's cooperating.

The government has failed to carry the heavy burden mandated by *Kastigar*. The Fifth Amendment protects an individual who has provided immunized information from having that information used against him "in *any* respect." *Kastigar v. United States*, 406 U.S. at 453, 92 S.Ct. at 1661 (emphasis in the original). The mere existence of a so-called "independent" source for the government's evidence does not end the inquiry; the source must be "*wholly*" independent. *Id.* at 406, 92 S.Ct. at 1665. Thus, if the information developed from the so-called "independent" source was obtained even indirectly as a result of "focusing" the inquiry made to that source, then there has been derivative use of the immunized information in violation of the defendant's fifth amendment rights.

The cases have been steadfast in protecting a witness who has provided immunized information from any use whatsoever of that information. For example, in *In re Grand Jury Proceedings*, 497 F.Supp. 979 (E.D.Pa.1980), the district court held that it was a sufficient "indirect" use of immunized testimony so as to impinge upon the defendant's fifth amendment rights merely

for a bankruptcy judge, after hearing immunized testimony pursuant to then 11 U.S.C. § 25(a)(10), to ask the trustee to refer the matter to the United States Attorney. The Court reached this conclusion despite its finding that there was "a very real likelihood" that the government would have "obtained a comparable investigatory lead from an entirely wholesome source." The Court stated that it was not persuaded to "the degree of conviction I believe to be required" that this "almost certainly" would have happened. 497 F.Supp. at 988. *See also United States v. Kurzer*, 534 F.2d 511 (2d Cir.1976), where the Court found that the mere fact that a witness had been motivated to cooperate with the government against an immunized witness, because the immunized witness had given testimony against him, was a sufficient derivative use to bar the prosecution.

Another case bearing on this point is *United States v. McDaniel*, 482 F.2d 305 (8th Cir.1973). There, the United States Attorney prosecuting the case had read the immunized testimony of a defendant at a time when he did not know that the testimony was immunized. The Court found that even though the government could prove independent sources for all of its evidence, the government had failed to prove that it still had not made derivative use of the testimony in some way "short of introducing tainted evidence." 482 F.2d at 311. The Court noted what is obvious to all criminal trial attorneys, namely, that knowing precisely the defendant's explanation of what happened is of invaluable assistance in focusing the investigation, deciding what questions to ask witnesses, determining what plea bargain to offer, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy.

Another indirect use proscribed by *Kastigar* is the fact that immunized information may confirm what the government already knows. *United States v. Dornau*, 359 F.Supp. 684, 687 (S.D.N.Y.1973), notes that even though the government may have already known everything which the immunized witness provided, the mere fact that the immunized witness corroborated previ-

ous information and assured the government that its case was "complete," was a type of indirect use from immunized information which the government would not have otherwise enjoyed.

While the government's identification of Larson, Davidson and Kincaid as potential witnesses may not be easily traced to Carpenter's immunized information, the government cannot say with the same assurance that the questioning of these witnesses, at least as it related to Carpenter, was not "focused" by the information which had been provided by Carpenter. Trial attorney Abbott has admitted that when he questioned Larson, Davidson and Kincaid, he already knew from the immunized information that Carpenter had given in East St. Louis that Carpenter had been involved in the making of bonds for various Company individuals, including the bonds that were made in South Carolina to release Davidson and Kincaid.

Though Abbott was not aware of all the circumstances concerning the making of those bonds, apparently because he did not know everything Carpenter had said in East St. Louis about the bonds, he still knew that Carpenter was involved. He may not have appreciated how the bonds would fit in with his later theory that the making of bonds was part of Carpenter's "utility man" role, he knew Carpenter had something to do with the bonds. Thus, he inquired about the bonds, knowing that Carpenter was involved. It appears clear from the record in this case that the first inquiries of Davidson and Kincaid about Carpenter making bond for them in South Carolina occurred after the prosecutor learned of Carpenter's immunized admissions about making bonds for Company members.

This focusing of the questioning of Davidson and Kincaid is just the type of derivative use which cases such as *Kastigar* and *McDaniel* hold is in violation of the defendant's fifth amendment rights. The court is unable to conclude that Carpenter suffered no detriment as a result of the information he disclosed concerning his participation in the making of the bonds, because what Carpenter had revealed about the bonds after being promised immunity was clearly part of the process in developing some of the most damaging evidence admitted against him at trial. *United States v. Gregory*, 730 F.2d 692 at 698 (11th Cir.1984).

Further, the government has not established that the information given by Carpenter under promises of immunity has not been used by the government to confirm the truthfulness of what was being told to them by cooperating witnesses. Carpenter had told the government that one of the pilots of the flight was Ike Battern, that the flight went into North Carolina some time around Thanksgiving of 1979, that at a later stage there was a large amount of money which turned up missing resulting in the giving of lie detector tests and the shooting up of a telephone book, that money had to be paid in Antigua in order to get the plane released, and that the trip had been arranged between Rick Thorpe and Hubert Cotton. Carpenter's information confirmed that the government's information obtained from other witnesses was correct and complete.

One of the key aspects of Carpenter's involvement was, of course, the payment of over $100,000 to Antiguan authorities to gain release of the plane to fly the trip. The record of trial testimony indicates this money was allegedly paid to Vera Bird, Jr., the son of the Antiguan premier, through a gentleman named Tony Williams. The government now contends that no specifics concerning the November flight were mentioned after the immunity agreement was executed. However, the record indicates the contrary in some regards. Agent Moriarity's notes of the interview of Carpenter reflect a discussion of payments to Vera Bird of up to $125,000 "for help to the Company" and that Tony Williams "was present during payoffs." In his testimony before the magistrate, Carpenter recalled describing in detail how he had arranged and handled this payment.

## CONCLUSION

In view of the foregoing, the court concludes that the government has not carried the "heavy burden" required under *Kasti-*

*gar* as to the trial phase of the case. That is, the prosecution has not met its affirmative duty to prove that the evidence adduced at the trial relating to Carpenter was derived from legitimate sources, wholly independent of the immunized testimony. The court is unable to reach the same conclusion as to the indictment phase of the case, as the record does not support a finding of the possible derivative use of the immunized information before the grand jury. Accordingly, the Report and Recommendation of the magistrate is ADOPTED IN PART and REJECTED IN PART. Defendant's motion to suppress is GRANTED and his motion to dismiss the indictment is DENIED. Further, because of the failure of the government to establish that the evidence at trial was derived from wholly independent sources, the conviction of defendant Carpenter is hereby VACATED.