United States Court of Appeals,

Eleventh Circuit.

No. 95-5405.

UNITED STATES of America, Plaintiff-Appellee,

v.

Adrian PIELAGO, Maria Varona, Defendants-Appellants.

Feb. 17, 1998.

Appeals from the United States District Court for the Southern District of Florida. (No. 93-594-CR-DTKH), Daniel T.K. Hurley, Judge.

Before CARNES, Circuit Judge, and KRAVITCH and REAVLEY[*], Senior Circuit Judges.

CARNES, Circuit Judge:

Appellants Maria Varona and Adrian Pielago were jointly indicted, along with two others, in a multi-count indictment. After a one-week trial, a jury found Varona and Pielago guilty of conspiring to possess cocaine with the intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 846. They appeal their convictions and sentences. We reject Varona's sentence arguments without discussion, *see* 11th Cir. Rule 36-1, but two of her conviction-related arguments do warrant discussion, although not acceptance. She contends that the indictment against her should have been dismissed, because the government used her immunized statements to obtain it. She also contends that her conviction must be reversed, because the government's presentation of certain evidence against her at trial violated the proffer agreement. We reject her first contention as devoid of merit, and her second one because she failed to raise the issue in the district court. We do not believe that there was any error involving the proffer agreement, and we are convinced there was no plain error.

---

[*]Honorable Thomas M. Reavley, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

Pielago challenges both his conviction and sentence. We reject his conviction-related arguments summarily, *see* 11th Cir. Rule 36-1. However, we find merit in his contention that his sentence is due to be reversed, because the district court incorrectly calculated his criminal history by treating his prior term of confinement in a community treatment center as a "sentence of imprisonment" for purposes of U.S.S.G. § 4A1.1.

## I. FACTS

In mid-1993, the City of Miami Police Department and the Drug Enforcement Administration (DEA), through surveillance and undercover narcotics purchases, identified the homes of Frank Novaton and Jose Varona ("Jose") as drug distribution locations. The authorities discovered that Jose normally obtained cocaine from Novaton and brought it to his house, where he operated his cocaine distribution business. Further investigation revealed that Adrian Pielago and Jose's wife, Maria Varona ("Varona"), advised and assisted Jose in his drug operation. On November 6, 1993, Jose was arrested after surveillance indicated he was about to sell eight kilograms of cocaine that he had just received from Novaton to a drug dealer named "Carlos." For a short time after Jose's arrest, Novaton, Pielago, "Carlos," and Varona were unaware that Jose had been apprehended and were confused as to his whereabouts. During this confusion, Varona delivered one kilogram of cocaine to "Carlos" in a gray tool box.

Based on the government's investigation and the evidence gathered as a result of Jose's November 6 arrest, in December of 1993 a grand jury indicted Jose, Pielago, Rolando Caceras—who the government then believed was "Carlos"—and Varona. The indictment charged them with conspiring to possess cocaine with the intent to distribute it, and possession of cocaine with the intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Initially, Jose and Varona cooperated with the government, and they intended to plead guilty

in return for a reduced sentence. Varona signed a proffer agreement, agreeing to give the government information about the conspiracy in return for a promise to consider leniency. The agreement provided for "use immunity," specifying that none of the information or statements Varona provided would be used against her in any criminal proceeding, but it explicitly reserved the government's right to pursue investigative leads derived from Varona's proffered statements and to use any derivative evidence against her. Among her statements to the government, Varona named Carlos Hechavarria as the real "Carlos." The government, satisfied with Varona's proffer, said that it was willing to allow her to plead guilty to a lesser offense, namely, using a telecommunications facility to facilitate a narcotics transaction.

Based on Jose and Varona's statements, the government sought and obtained a superseding indictment which named Carlos Hechavarria as a conspirator and dropped the charges against Caceras. The superseding indictment also added the use of a telecommunications facility charge, in order to allow Varona to plead guilty to that charge.

However, Varona's cooperation ceased when her husband Jose was murdered. Fearing for their lives, Varona and her children were taken into protective custody. Apparently, Jose had been murdered because he had been cooperating with the government. His plea agreement had specifically required him to testify against his co-conspirators and other drug dealers. With Jose's death, the government needed Varona to testify, but she refused to do so. Because of her refusal, the government rescinded its plea offer. Varona and Pielago went to trial on the superseding indictment.

## II. DISTRICT COURT PROCEEDINGS

On the first day of trial, after the jury was sworn, Varona moved to dismiss the superseding indictment on the ground that the government had used her statements against her before the grand

jury in violation of her proffer agreement. Because she refused to ask for a mistrial, the district court declined to rule on her motion to dismiss the indictment until after trial, warning her that under *United States v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), a guilty verdict might eliminate her claim.

Hechavarria, who had pleaded guilty, testified for the government at trial, providing much of the evidence against Varona and Pielago. Varona did not object to introduction of Hechavarria's testimony as a breach of her proffer agreement. The jury found her and Pielago guilty of conspiring to possess cocaine with the intent to distribute it. However, the jury acquitted Pielago of possessing cocaine, and deadlocked on the possession and telecommunications facility charges against Varona. Those charges were later dismissed.

Following the verdicts, the district court conducted an evidentiary hearing pursuant to *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), in order to determine whether the government had violated Varona's proffer agreement. The court held that the government had not violated the proffer agreement by using Varona's statements to obtain the superseding indictments, because it found that the government had prior knowledge of and independent sources for the evidence used to indict Varona. Accordingly, the district court denied Varona's motion to dismiss the superseding indictment.

The district court then conducted a sentencing hearing. At that hearing the court found Varona and Pielago responsible for the nine kilograms of cocaine involved in the conspiracy (the eight confiscated when agents arrested Jose plus the one in the tool box that Varona gave Hechavarria). Based on that amount of cocaine, the district court determined that both their base offense levels were thirty. Because Varona had a Category I criminal history, the district court sentenced Varona to 97 months imprisonment, the minimum term for her sentencing range of 97 to

121 months.

The probation officer recommended that Pielago be given seven criminal history points, resulting in a Category IV criminal history. Pielago objected in part, contending that he should be given one rather than two criminal history points for his 1986 conviction for conspiring to transfer an automatic firearm because his sentence of six months had been served in a community treatment center. The district court disagreed, because it considered the six-month sentence to a community treatment center to be a "sentence of imprisonment" under § 4A1.1, which prescribed two criminal history points. Accordingly, Pielago was given a Category IV criminal history, instead of a Category III. As a result, Pielago's sentencing range was 135 to 168 months. The court sentenced him to 140 months imprisonment.

### III. STANDARDS OF REVIEW

We review the district court's denial of Varona's motion to dismiss the indictment for an abuse of discretion. *See United States v. Thompson,* 25 F.3d 1558, 1562 (11th Cir.1994). Because Varona did not object to Hechavarria's testimony at trial, we review only for plain error the admission of that testimony. *See* Fed.R.Crim.P. 52(b). Finally, we review the district court's interpretation of the sentencing guidelines *de novo. See United States v. Coe,* 79 F.3d 126, 127 (11th Cir.1996).

### IV. DISCUSSION

#### A. WHETHER THE SUPERSEDING INDICTMENT SHOULD HAVE BEEN DISMISSED

Varona challenges the district court's denial of her motion to dismiss the superseding indictment. Because the grand jury which issued the superseding indictment heard her immunized statements, she contends that indictment should have been dismissed. Varona relies on *United States v. Tantalo,* 680 F.2d 903, 909 (2d Cir.1982), in which the Second Circuit adopted a per se rule

that an indictment must be dismissed as to any defendant whose immunized statement or testimony was heard by the grand jury returning the indictment. However, to the extent that *Tantalo* establishes a per se rule[1], we disagree with it. We have never accepted a per se rule for dismissing indictments obtained as a result of a defendant's immunized testimony; the facts of this case show why a per se rule is inappropriate.

The grand jury returned the original indictment against Varona based on the testimony of a DEA case agent named Lucas. Subsequently, Varona made her proffer statements inculpating Hechavarria. Later, the same grand jury heard Agent Lucas' recitation of Varona's proffer statements and returned the superseding indictment. The superseding indictment reflected but two substantive changes: (1) Hechavarria was substituted for Caceras in the conspiracy count; and (2) a count for using a telecommunications facility to facilitate a narcotics transaction was added against Varona.

It is clear that the addition of the telecommunications facility count was harmless; that charge was dismissed after the jury deadlocked on it. So, too, was the change in the conspiracy count. Varona does not challenge the validity of the conspiracy count in the original indictment, nor does she contend that there would have been a material variance between the proof and the indictment if that court had not been modified. Varona's proffer statements were only used "against"

---

[1]The *Tantalo* Court held that a superseding indictment should have been dismissed where the government obtained an additional count, for which the defendant was ultimately convicted, by using the defendant's immunized testimony before the grand jury. *See* 680 F.2d at 904-06. Although the Second Circuit stated that the whole indictment should have been dismissed "as a matter of law," *see id.* at 909, we are not sure it intended a broad rule requiring that the indictment be dismissed in every instance where the government uses immunized testimony to obtain a superseding indictment. The Second Circuit reversed the defendant's conviction because the government failed to make a showing that it had legitimately obtained the information upon which it indicted the defendant, and the trial court failed to conduct a *Kastigar* hearing on the matter. *See id.* at 908-09. The circumstances of this case are different.

her to accuse her of conspiring with Jose, Pielago, and Hechavarria, instead of with Jose, Pielago, and Caceras. Either way, she was still on the hook for her participation in the conspiracy; it matters not with whom she shared that hook. *See, e.g., United States v. Davis,* 679 F.2d 845, 851 (11th Cir.1982)("The existence of the conspiracy agreement rather than the identity of those who agree is the essential element to prove conspiracy."). Therefore, the use of Varona's proffer statement resulting in a change of the indictment did not prejudice her. Accordingly, the district court did not abuse its discretion in refusing to dismiss the superseding indictment.

B. WHETHER THE GOVERNMENT VIOLATED THE PROFFER AGREEMENT BY USING HECHAVARRIA AS A WITNESS AGAINST HER

Because Varona did not object to the government calling Hechavarria as a witness, we can only reverse her conviction if it was plain error for the district court to allow him to testify. *See* Fed.R.Crim.P. 52(b). The plain error rule places a daunting obstacle before Varona. In *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993), the Supreme Court held that for a judgment to be reversed for plain error, three conditions must exist: (1) a legal error must have been committed; (2) that error must be plain; and (3) the error must have affected the substantial rights of the appellant.

Even if all three requirements are met, it is still within the court of appeals' discretion whether to correct the forfeited error. *See United States v. King,* 73 F.3d 1564, 1572 (11th Cir.1996); *United States v. Vazquez,* 53 F.3d 1216, 1221 (11th Cir.1995). Moreover, that discretion may be exercised "to notice a forfeited error only if ... the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Johnson v. United States,* --- U.S. ----, ----, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997); *accord United States v. Gaudin,* 515 U.S. 506, 527, 115 S.Ct. 2310, 2322, 132 L.Ed.2d 444 (1995)("A court of appeals should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial

proceedings")(internal quotation marks and brackets omitted).

The narrowness of the plain error rule is a reflection of the importance, indeed necessity, of the contemporaneous objection rule to which it is an exception. The contemporaneous objection rule fosters finality of judgment and deters "sandbagging," saving an issue for appeal in hopes of having another shot at trial if the first one misses. *See, e.g., Esslinger v. Davis,* 44 F.3d 1515, 1525 and n. 36 (11th Cir.1995)(contemporaneous objection rule "deters "sandbagging,' the withholding of claims in an effort to get more than "one bite at the apple.' "): *United States v. Joshi,* 896 F.2d 1303, 1307 and n. 3 (11th Cir.1990)(noting "the Supreme Court's "admonition against "sandbagging" on the part of defense lawyers' who intentionally decline to object to a potentially unconstitutional trial procedure in order to inject reversible error into the proceeding."); *Spencer v. Kemp,* 781 F.2d 1458, 1473 (11th Cir.1986)("contemporaneous objection rules prevent a defendant from "sandbagging,' taking a chance on a jury verdict while reserving his claim in the event of an unfavorable verdict").

The contemporaneous objection rule also promotes the salutary interest of making the trial the main event. Failure to enforce it "tends to detract from the perception of the trial of a criminal case ... as a decisive and portentous event." *Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). Moreover, requiring timely objections allows trial courts to develop a full record on the issue, consider the matter, and correct any error before substantial judicial resources are wasted on appeal and then in an unnecessary retrial. *See United States v. Sorondo,* 845 F.2d 945, 948-49 (11th Cir.1988). A full record and a prior decision in the district court are essential ingredients to our substantive review of issues—they flesh out an issue in a way the parties' briefs may not.

"In the absence of plain error ... it is not our place as an appellate court to second guess the

litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate." *Adler v. Duval County School Bd.,* 112 F.3d 1475, 1481 n. 12 (11th Cir.1997). Because the contemporaneous objection rule is essential to the integrity and efficiency of our judicial process, we have stressed that "[t]he plain error test is difficult to meet." *United States v. King,* 73 F.3d 1564, 1572 (11th Cir.1996); *accord, e.g., United States v. Sorondo,* 845 F.2d at 948-49; *United States v. Chaney,* 662 F.2d 1148, 1152 n. 4 (5th Cir. Unit B 1981). We turn now to application of that test to the issue at hand. Of course, there can be no plain error if there was no error at all. So, we begin with this inquiry: was there any error, plain or not?

Varona's proffer agreement precludes the government from using in criminal proceedings against her any "information or statements" it acquired from her in the course of her cooperation. She contends that the government's use of Hechavarria's testimony, which it acquired only because of Varona's statements, is a breach of the proffer agreement. Therefore, she argues, the district court should not have allowed Hechavarria to testify against her.

The construction of proffer agreements, like plea agreements, is governed generally by the principles of contract law, as we have adapted it for the purposes of criminal law. *See United States v. Weaver,* 905 F.2d 1466, 1472 (11th Cir.1990); *Rowe v. Griffin,* 676 F.2d 524, 528 (11th Cir.1982) (interpreting immunity agreements pursuant to principles applied to interpretation of plea agreements); *cf. United States v. Jefferies,* 908 F.2d 1520, 1523 (11th Cir.1990) ("Plea agreements are interpreted and applied in a manner that is sometimes likened to contractual interpretation."). "This analogy, however, should not be taken too far." *Jefferies,* 908 F.2d at 1523. A "hyper-technical reading of the written agreement" and "a rigidly literal approach in the construction of language" should not be accepted. *In re Arnett,* 804 F.2d 1200, 1203 (11th Cir.1986)(internal citation and quotes omitted). The written agreement should be viewed "against the background of

the negotiations." *Id.* Any ambiguities in the terms of a proffer agreement should be resolved in favor of the criminal defendant. *See Rowe,* 676 F.2d at 526 n. 4.

Paragraph three of the proffer agreement in this case states, in relevant part:

No information or statement provided by Maria Varona may be used against [her] in this case or any other criminal investigation....

Gov. Ex. 48 at 1-2, para. 3. However, the proffer agreement further provides in paragraph four that:

The government also expressly reserves the right to pursue any and all investigative leads derived from Maria Varona's statements or information and use such derivative evidence in any criminal or civil proceeding against her and/or others.

Gov. Ex. 48 at 2, para. 4. Those two paragraphs set out two separate terms: (1) the government may not use the information or statements obtained from Varona directly against her, which is to say it may not use them as evidence to obtain an indictment or guilty verdict; but (2) the government may use evidence derived from her information or statements against her to obtain an indictment or guilty verdict.

If only paragraph three existed, we might well agree with Varona and conclude that the government, by using testimony it would not have obtained but for the "information" provided by Varona, violated her proffer agreement. Without the information she provided, the government would not have known that "Carlos" was Hechavarria, instead of Caceras, and therefore would not have indicted Hechavarria. Had the government not indicted Hechavarria, he would have had no incentive to testify against Varona. Therefore, the government "used" Varona's information against her in the broadest sense of the term.

However, paragraph four explicitly allows the government to use evidence derived from the information and statements Varona proffered against her. We do not believe that the two paragraphs, when properly construed, conflict. It is a cardinal principle of contract law that no term of a contract should be construed to be in conflict with another unless no other reasonable

construction is possible. *See Guaranty Financial Services, Inc. v. Ryan,* 928 F.2d 994, 1000 (11th Cir.1991); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983). In this case, paragraph four should be read as qualifying, instead of contradicting, paragraph three. Both paragraphs describe the governments' right to use evidence acquired from Varona's proffer. Paragraph three, read together with paragraph four, prohibits the government from directly using the statements and information which made up Varona's proffer against her. Paragraph four correspondingly allows the government to use evidence derived from her proffer statements against Varona. The fact that Varona's trial counsel did not object to Hechavarria's testimony indicates that her lawyer, the same lawyer who negotiated the proffer agreement for Varona, believed then that the government was within its rights to put Hechavarria on the stand.

Moreover, even if the provisions of the two paragraphs conflicted, another contract interpretation principle would vindicate the government's position. When two contract terms conflict, the specific term controls over the general one. *See United States Postal Service v. American Postal Workers Union,* 922 F.2d 256, 260 (5th Cir.1991); *Boatmen's National Bank of St. Louis v. Smith,* 835 F.2d 1200, 1203 (7th Cir.1987)("Where the document contains both general and specific provisions relating to the same subject, the specific provision controls"). In Varona's proffer agreement, paragraph three is the general provision, using broad language to forbid the government from using statements or information it acquired from Varona against her; paragraph four is the specific term, permitting the government to use evidence it derived from the information and statements she gave against her.

Consistent with paragraph four, the more specifically applicable provision, the government's use of Hechavarria's testimony did not breach the agreement. The government used Varona's proffer statements to indict Hechavarria. As a result of his indictment, Hechavarria decided to cooperate,

plead guilty and testify against Varona and Pielago. Therefore, by its very nature, Hechavarria's testimony was derivative evidence. *See Black's Law Dictionary* 443 (6th Ed.1991)(defining derivative as "coming from another; taken from something preceding; secondary ... [a]nything obtained or deduced from another"). The government was only forbidden from introducing Varona's statements and the information she provided into evidence against her, and did not violate the proffer agreement by putting Hechavarria on the stand. Because it would not have been error for the district court to allow Hechavarria to testify even if there had been an objection, there is no plain error.

The dissenting opinion leaves us unmoved. Its position is based upon an interpretation of the term "derivative evidence" in paragraph four that is at variance with the plain meaning of that term. The dissenting opinion constructs a hypothetical involving hidden cocaine, which might be interesting to discuss in an academic setting, but it bears no resemblance to the facts of this case. What happened in this case is that Varona made statements conveying information to the government. The government did not introduce any of those statements into evidence against Varona. Instead, it used what she said to obtain an indictment of Hechavarria. His indictment was derived from Varona's statements and information. Hechavarria's indictment was not evidence against Varona. Instead, the government used Hechavarria's indictment in its successful effort to persuade him to cooperate. Thus, his cooperation including his testimony against Varona was derived, in part, from an indictment which was in turn derived from statements and information Varona gave. We do not think that Hechavarria's testimony, which is two steps removed in the derivative chain from Varona's statements and information, can be considered anything but "derivative evidence," which paragraph four expressly permits the government to use.

Moreover, even if we were to conclude that it was error for the district court to have allowed Hechavarria's testimony, we would not conclude that such an error was plain error. In practice,

errors become plain errors in either of two ways. First, an intervening decision of this Court or the Supreme Court squarely on point may make an error plain. *See, e.g., United States v. Antonietti,* 86 F.3d 206, 208-09 (11th Cir.1996)(intervening decision of this Court made counting seedlings as marijuana plants plain error); *United States v. Walker,* 59 F.3d 1196, 1198 (11th Cir.1995)(intervening decision of the Supreme Court holding the Gun Free School Zone Act unconstitutional made defendant's conviction under the law plain error). Second, errors have been found to be plain where they are particularly egregious, and strike at a core principle which the violated rule or law embodies. *See, e.g., United States v. Quinones,* 97 F.3d 473, 475 (11th Cir.1996)(finding plain error where district court failed to ensure that the defendant understood the nature of the charges against him, one of the core principles of Fed.R.Crim.P. 11).

The dissenting opinion never satisfactorily explains why, if the error in interpretation it perceives is "plain," that error escaped the attention not only of the district court judge but also of the very defense counsel who negotiated the terms of the agreement. Nor does the dissent adequately explain how such a "plain" error could appear, even after briefing and oral argument, to be no error at all to two-thirds of this panel. We have previously recognized that "no one is perfect, least of all federal appellate judges." *United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993). Notwithstanding that truth, if the "plain" requirement of the Rule 52(b) plain error provision is to have any teeth, when two of the three judges who address a matter conclude that there is no error at all, that must mean there is no plain error. As the Supreme Court has held, "[a]t a minimum, court[s] of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law." *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993).

C. WHETHER CONFINEMENT IN A COMMUNITY TREATMENT CENTER IS A SENTENCE OF IMPRISONMENT FOR THE PURPOSES OF § 4A1.1

Pielago challenges the district court's determination of his criminal history category. Specifically, he argues that the district court should have given him one less criminal history point, because his 1986 six-month sentence to a community treatment center should not have been considered a "sentence of imprisonment" for the purposes of § 4A1.1(b) of the Sentencing Guidelines. That criminal history point makes a difference, because without it his criminal history category is III, which means a sentencing range of 121 to 151 months instead of 135 to 168 months. The issue Pielago presents is one of first impression for this Court, although two of our sister circuits have addressed matters relating to it.

We begin, as always, with the text of the Sentencing Guidelines. U.S.S.G. § 4A1.1 provides, in relevant part:

> The total points from items (a) through (f) determine the criminal history category in the Sentencing Table ...
>
> (a) Add 3 points for each prior sentence of imprisonment exceeding one year and one month.
>
> (b) Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a)
>
> (c) Add 1 point for each prior sentence not counted in (a) or (b), up to a total of 4 points for this item.

Pielago contends that a six-month sentence to a community treatment center falls within subsection (c) instead of (b), because it is not a "sentence of imprisonment." For a definition of "sentence of imprisonment" within the meaning of § 4A1.1(b) we look to the Sentencing Guidelines' commentary. Note 1 of the commentary to § 4A1.1 refers us to § 4A1.2 for a definition of the term. Section 4A1.2(b) states that "sentence of imprisonment means a sentence of incarceration ...," a definition that is not particularly helpful to our analysis.

Fortunately, the background commentary to § 4A1.1 sheds some light on what the Sentencing Commission meant by a "sentence of imprisonment":

> Subdivisions (a), (b), and (c) of § 4A1.1 distinguish confinement sentences longer than one year and one month, shorter confinement sentences of at least sixty days, and all other sentences, such as confinement sentences of less than sixty days, probation, fines, and residency in a halfway house.

U.S.S.G. § 4A1.1 comment. (backg'd). That commentary makes it clear that a sentence to a halfway house is not a "sentence of imprisonment." But the commentary uses residency in a halfway house as an example, not an exhaustive list of the types of confinement that are not "sentences of imprisonment." The question we must decide, then, is whether for the purposes of § 4A1.1 confinement in a community treatment center equates to residency in a halfway house or instead to a sentence of confinement. Our circuit has no decision close to point.

We begin by looking at how other circuits have answered related questions. In *United States v. Rasco,* 963 F.2d 132, 135-36 (6th Cir.1992), the Sixth Circuit concluded that confinement in a community treatment center as a result of a parole revocation was "imprisonment" under § 4A1.2(k). The *Rasco* Court reasoned that the Sentencing Commission was focusing on the *reason* for the defendant's confinement, not his *place* of confinement. *See id.* at 135. The court explained that because § 4A1.2(k) deals with confinement as a result of parole revocation, the Commission was obviously concerned with the reason why the defendant had been confined, the defendant's failure to stay out of trouble while on parole. *See id.* at 135-36. Therefore, it was irrelevant where the defendant spent his sentence; only the fact that the his parole had been revoked was determinative. *See id.* However the *Rasco* Court did "recognize that this interpretation arguably conflicts with the background commentary to section 4A1.1" *Id.* at 136.

Whether it conflicts with the commentary or not, *Rasco* is distinguishable from this case. Section 4A1.2(k), which is concerned with calculating the criminal histories of prior parole violators, implicates a different set of policy concerns than does § 4A1.1. The Sentencing Commission had a reason to more harshly sanction those who have violated parole in the past, even

though the resulting incarceration was only in a halfway house or community treatment center. However, Pielago's stay in a community treatment center was not the consequence of a parole violation. He was sentenced directly to that confinement. Therefore, the *Rasco* Court's reasoning is not applicable to this case. *See also United States v. Jones,* 107 F.3d 1147, 1161-65 (6th Cir.1997) (limiting the *Rasco* decision, and holding that a sentence of home detention is not a "sentence of imprisonment" for § 4A1.1 purposes).

A year later, the Ninth Circuit, addressing exactly the same issue as the *Rasco* Court, concluded that a term of confinement in a community treatment center is *not* a "sentence of imprisonment," even when it resulted from revocation of parole. In *United States v. Latimer,* 991 F.2d 1509, 1516 (9th Cir.1993), the Ninth Circuit declined to follow *Rasco,* and rejected the idea that the term "sentence of imprisonment" meant anything other than precisely what it says. *See id.* The *Latimer* Court based its holding on what the Sixth Circuit acknowledged but failed to be guided by: the background commentary to § 4A1.1. *See id.* at 1515. Because that commentary distinguishes a term of confinement in a halfway house from a sentence of imprisonment, the Ninth Circuit concluded that the question was whether a term confinement in a community treatment center should be included along with residency in a halfway house as a sentence that is not a "sentence of imprisonment." *See id.* at 1516. It answered affirmatively, noting that community treatment centers and halfway houses are treated as equivalent forms of punishment throughout the Sentencing Guidelines. *See id.* at 1512-13.

We agree with the Ninth Circuit's reasoning in *Latimer.* Several Sentencing Guidelines provisions indicate that the Commission considers confinement in a community treatment center, like confinement in a halfway house, not to be "imprisonment." Section 5C1.1(d) provides that district courts may sentence defendants whose sentencing range is six to ten months to "community

confinement" in lieu of part of their sentence of imprisonment. Section 5F1.1 defines "community confinement" as "residence in a community treatment center, halfway house ... or other community facility." U.S.S.G. § 5F1.1 comment. (n.1). These two provisions indicate that the Sentencing Commission considered a sentence to confinement in a community treatment center to be different from a "sentence of imprisonment."

The Sentencing Guidelines also indicate that community treatment centers and halfway houses are functionally equivalent. Section 2P1.1(b)(3) states that "if the defendant escaped from the non-secure custody of a community corrections center, community treatment center, "halfway house,' or similar facility, .... decrease the offense level by 4 levels." Similarly, § 5B1.4(b)(19) states that "residence in a community treatment center, halfway house or similar facility may be imposed as a condition of probation or supervised release." These two provisions show that the Sentencing Commission considered time served in community treatment centers and halfway houses to be equivalent to each other and distinct from a sentence of imprisonment.

As a matter of fact, in five of the six sections of the Sentencing Guidelines in which the term "halfway house" appears, the term "community treatment center" appears right alongside it. *Compare* U.S.S.G. §§ 2J1.6(b)(1)(B); 2P1.1(b)(3); 5B1.4(b)(19); 5C1.1(e)(2); 5F1.1 comment. (n.1) *with* U.S.S.G. § 4A1.1 comment. (backg'd). The only time "halfway house" does not appear with "community treatment center" is in the background commentary to § 4A1.1. We do not read any significance into that omission. The Sentencing Commission simply did not make an all-inclusive list there. Instead, "halfway house" is used only as an illustrative example of the types of confinements that are not to be considered "imprisonment" under § 4A1.1.

For these reasons, we join the Ninth Circuit in concluding that a term of confinement in a community treatment center, like residency in a halfway house, is not a "sentence of imprisonment"

for the purposes of § 4A1.1. As a result, § 4A1.1(c) applies in this case, and Pielago should have been given only one criminal history point for his 1986 conviction and sentence. Accordingly, his criminal history category should have been III and his sentencing range 121 to 151 months.

## V. CONCLUSION

We AFFIRM Varona's conviction and sentence. We AFFIRM Pielago's conviction, but we VACATE his sentence and REMAND his case to the district court for resentencing.

KRAVITCH, Senior Circuit Judge, concurring in part and dissenting in part:

I join Part IV.C of the majority opinion, which affirms Pielago's conviction, vacates his sentence, and remands his case for resentencing.[1] I respectfully disagree, however, with the majority's disposition of Varona's appeal. In my view, the government violated Varona's proffer agreement when, after indicting Hechavarria on the basis of Varona's immunized statement and entering into a plea agreement with him, it had Hechavarria testify against Varona concerning the very delivery of cocaine that she described in her statement.[2] Because the government had no legitimate and wholly independent source for Hechavarria's testimony, allowing the testimony was

---

[1]Vacating Pielago's sentence of 140 months is appropriate even though that sentence lies within the 121- to 151-month sentencing range that we prescribe upon remand. The district court imposed the 140-month sentence under the assumption that the sentencing range was 135 to 168 months. Because the district court did not clearly state that it would have imposed the 140-month sentence even if the sentencing range were 121 to 151 months, we must remand the case for resentencing. *Cf. United States v. De La Torre,* 949 F.2d 1121, 1122 (11th Cir.1992) (declining to resolve a dispute as to which guideline range was applicable when the trial court made clear that the same sentence would have been imposed irrespective of the outcome of the dispute).

[2]In her statement, Varona admitted that on November 6, 1993, after her husband's arrest, she gave Hechavarria a scale for weighing cocaine and sold him the kilogram of cocaine that remained in the Varona home. Interview of Maria Varona, Gov. Ex. 49, at 2. Similarly, Hechavarria testified that Varona called him on November 6, after her husband's arrest, and asked him to come to the Varona home. Upon Hechavarria's arrival, Varona handed him a gray tool box, which, when opened by Hechavarria, revealed, *inter alia,* a weighing scale and a kilogram of cocaine. R6: 456-57.

patent error. Moreover, the error was not harmless, given the fact that the government introduced no other evidence at trial that would have allowed a reasonable jury to convict Varona. Varona therefore has established the elements of plain error. *See United States v. Olano,* 507 U.S. 725, 732-735, 113 S.Ct. 1770, 1777-78, 123 L.Ed.2d 508 (1993) (stating that plain error is clear or obvious error that affects substantial rights, in that it is prejudicial and not harmless).

Furthermore, correcting this error on appeal would be a proper use of this court's discretionary powers. Because Varona was sentenced to more than eight years of imprisonment for a conspiracy conviction based solely on evidence obtained in violation of her proffer agreement, I believe that the district court's error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *See Olano,* 507 U.S. at 736-37, 113 S.Ct. at 1779 (citation omitted). I would reverse her conviction and remand her case for a new trial.[3]

I.

Varona's proffer agreement, interpreted according to fundamental tenets of contract construction, prohibited the government from acting as it did in this case. According to Paragraph 3 of the proffer agreement, "no information or statement provided by Maria Varona may be used against [her] in this case or in any other criminal investigation...."[4] Paragraph 4 merely qualified that protection by giving the government "the right to pursue any and all investigative leads derived from Maria Varona's statements or information and use such derivative evidence in any criminal or civil proceedings against her and/or others."[5] Interpreted together, Paragraphs 3 and 4 barred the

---

[3]I thus dissent as to Part IV.B of the majority opinion. I concur with Part IV.A, which rejects Varona's argument that the superseding indictment should have been dismissed.

[4]Proffer Agreement of Maria Varona, Gov. Ex. 48, at 1-2, ¶ 3.

[5]*Id.* at 2, ¶ 4. The agreement expressly stated that it did not impart "transactional immunity" to Varona. *Id.* at ¶ 7.

government both from using Varona's "statements" against her and from using Varona's "information" against her in the most direct way possible. The government violated the latter prohibition by using Varona's information to prove, in the most direct way possible, that she distributed cocaine; on the basis of Varona's immunized statement that she delivered cocaine to Hechavarria, the government at Varona's trial procured *Hechavarria's* testimony about the *same* transaction.

I respectfully believe that the majority errs in ruling otherwise. Despite its initial admonition that, whenever possible, "no term of a contract should be construed to be in conflict with another," the majority concludes that the language of Paragraph 4 trumps the general term "information" in Paragraph 3. The majority thus holds that Paragraph 4 permitted Hechavarria's testimony as merely derivative evidence obtained from investigative leads. The majority's interpretation not only violates its own principle of contract construction but also effectively disregards the unique language of Paragraph 3. Unlike common proffer agreements that bar *only* the defendant's immunized *statements* from being used in the government's case-in-chief,[6] the proffer agreement in this case explicitly prohibited the government from using Varona's "statements *or information* " against her.[7] It is a

---

[6]*See, e.g, United States v. Chiu,* 109 F.3d 624, 626 (9th Cir.1997) (stating that the defendant's immunized statements could be used to prepare witnesses where the government only had agreed not to "offer in evidence in its case-in-chief ... any statements made by the defendant"); *United States v. Liranzo,* 944 F.2d 73, 76-77 (2d Cir.1991) (stating that the proffer agreement, which only barred the government's use of the defendant's "statements" as evidence at trial, allowed the government to use the defendant's immunized identification of himself as the "Frank" named in the original indictment to refresh the informant's memory of "Frank's" identity and then to file the superseding indictment with "Frank" correctly identified); *cf. United States v. Rutkowski,* 814 F.2d 594, 599 (11th Cir.1987) (holding that Fed.R.Crim.P. 11(e)(6)(D) only excludes evidence of "statements" made in course of plea discussions and "makes no reference to anything other than evidence of "statements' as being excludable").

[7]In contrast to proffer agreements that bar only the use of "statements," those agreements that prohibit the government's use of "information" are broad in scope. In *United States v. Carpenter,* 611 F.Supp. 768, 771 (N.D.Ga.1985), the court analyzed, *inter alia,* an unwritten

time-honored principle of contract construction that contracts should be interpreted so as to give meaning to each and every word. *See* 17A Am.Jur.2d Contracts § 387 (1991) (stating that no word in a contract should be rejected as mere surplusage if the court can determine any reasonable purpose for that word); *id* ("A construction will not be given to one part of a contract which will annul or obliterate another part."); *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985) (describing "well accepted and basic principle that an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless").[8]

The majority's interpretation would render useless the protection given by Paragraph 3 to "information" provided by Varona. Whenever the government decides to use "information" (as opposed to "statements") provided by a defendant against that defendant at trial, the government must take steps to procure the relevant evidence and present it at trial. According to the majority's reasoning, these steps *always* render the procured evidence merely "derivative evidence" from "investigative leads," permissible under Paragraph 4 of the agreement. The majority's interpretation thus effectively deletes the term "information" from Paragraph 3.

---

agreement that "any information furnished by the defendant "would not be used against him.' " *Id.* at 775. The court held that any ambiguity "should be resolved in favor of the criminal defendant," *id.* at 776 (quoting *Rowe v. Griffin,* 676 F.2d 524, 526 n. 4 (11th Cir.1982)), and thus the court rejected the government's argument that the defendant was only protected "against direct use of his statements," *id.* at 775. *See also United States v. Pelullo,* 917 F.Supp. 1065, 1071 (D.N.J.1995) (holding that immunity letter stating that no "information" provided by defendant may be used against him in any criminal case was "expressed in the broadest possible terms" and provided full use and derivative use immunity).

[8]Indeed, the very contract cases cited by the majority conclude that "[a]n interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions meaningless." *Guaranty Financial Services, Inc. v. Ryan,* 928 F.2d 994, 999-1000 (11th Cir.1991) (quoting *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983)).

Read together properly, Paragraphs 3 and 4 are consistent. The two provisions *barred* the government from using Varona's information to inculpate her by the most direct means possible, but they *allowed* the use of Varona's information to obtain "derivative evidence" from "investigative leads." This interpretation, unlike the majority's, satisfies the majority's own requirement that "no term of a contract should be construed to be in conflict with another unless no other reasonable construction is possible." *Guaranty Financial Services, Inc. v. Ryan,* 928 F.2d at 1000 (quoting *United States v. Johnson Controls, Inc.* 713 F.2d at 1555). Furthermore, only this interpretation of the contract preserves the independent meaning of the term "information" in Paragraph 3. *See* 17A Am.Jur.2d Contracts § 387; *Fortec Constructors,* 760 F.2d at 1292; *Guaranty Financial Services,* 928 F.2d at 999-1000; *Johnson Controls,* 713 F.2d at 1555.

An example illustrates the difference between this interpretation and that of the majority. Assume that Varona, pursuant to this proffer agreement, told the authorities about the location of hidden cocaine in her home. Under the majority's reasoning, the proffer agreement would allow the government to use Varona's information to obtain a warrant, seize the cocaine, and introduce it as evidence against Varona at trial. The majority presumably would consider the cocaine to be evidence "two steps removed in the derivative chain from Varona's statements and information" and therefore permitted by the "controlling" language of Paragraph 4.

Properly interpreted, however, the proffer agreement clearly would bar such a government strategy. In order to preserve the meaning of the term "information" in Paragraph 3, the agreement at a minimum must prohibit the government from using Varona's information to inculpate her in the most direct way possible. The agreement thus must prohibit the government from proving Varona's possession of cocaine by simply introducing the very cocaine that Varona herself told the government how to locate. This direct proof of Varona's possession would constitute the use of

Varona's "information" against her, prohibited by Paragraph 3, *not* the use of "derivative evidence" obtained from "investigative leads," allowed by Paragraph 4. I believe that this interpretation of the proffer agreement, unlike the majority's, appropriately reflects the entire agreement and ensures that the term "information" in Paragraph 3 retains independent meaning.

Having determined the plain meaning of the proffer agreement, I conclude that the government violated the agreement in this case. Just as the government in the example above would have used Varona's information to prove her *possession* of cocaine in the most direct way possible, here the government used Varona's information to prove her *distribution* of cocaine in the most direct way possible. Namely, the government used Varona's description of her delivery of cocaine in order to obtain the *recipient's testimony* about the *same* delivery. Apart from using Varona's own statement against her at trial (a strategy barred by Paragraph 3's protection of Varona's "statements"), the government has no more direct way of proving Varona's distribution of cocaine. If Paragraph 3's protection of Varona's "information" is to retain independent meaning, then the agreement must be read to bar the government's actions in this case.

Contrary to the majority's assertion, this interpretation of the proffer agreement is consistent with the plain meaning of Paragraph 4. Even though the agreement prohibited the government from using Varona's information to demonstrate her culpability by the most direct means possible, the government nonetheless had ample authority to use "derivative evidence" obtained from "investigative leads." For example, the government could have relied on Varona's implication of Hechavarria to interview Hechavarria's neighbors. Then, consistent with the proffer agreement, one of the neighbors possibly could have testified at Varona's trial that he frequently had seen Varona enter Hechavarria's house with packages and leave without them and that he had been visiting Hechavarria when Varona arrived with a package containing white powder. Unlike the use of

Hechavarria's testimony about the very transaction described by Varona, the use of the neighbor's testimony would not constitute the direct use of Varona's information against her, and it therefore would be permitted under Paragraph 4 of the agreement.[9]

---

[9]My analysis, of course, does not extend to several circumstances not before this court. First, I do not suggest that the proffer agreement would have prohibited the government's behavior if Paragraph 3 merely had barred the government from using "statements" of the defendant against her in its case-in-chief and if Paragraph 4 had allowed the government to use all "information" provided by the defendant against her.

Second, I do not that Varona could have used her immunized statement to bar Hechavarria's trial testimony if he was going to testify against her even absent her statement. *Cf. United States v. Wiley,* 997 F.2d 378, 381-82 (8th Cir.) (holding that the witness's testimony did not violate the proffer agreement in which the government had agreed that any information provided by the defendant would not be used to formulate additional criminal charges against him; noting that the witness already had given information about the defendant before the defendant was even arrested or questioned), *cert. denied,* 510 U.S. 1011, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993); *United States v. Blau,* 961 F.Supp. 626, 631 (S.D.N.Y.1997) (holding that the witness's testimony did not violate statutory use and derivative use immunity, *see* 18 U.S.C. § 6002, where the defendant's proffer implicating the witness did not influence witness's decision to plead guilty and inculpate defendant).

Third, I do not suggest that the proffer agreement would have barred Hechavarria's trial testimony if he had testified not about the same transaction described in Varona's statement, but instead about *other* narcotics trafficking in which Varona may have been engaged. *Cf. United States v. Catano,* 65 F.3d 219, 226 (1st Cir.1995) (holding that the district court properly allowed the witness to testify that the defendant stored *marijuana* at witness's home, where the grant of immunity concerned only the "direct use of the [defendant's] testimony" and where the defendant had identified the witness to the government while exposing a *fentanyl* operation at the witness's home). I merely would hold that the proffer agreement barred the government from putting on Hechavarria's testimony about the *very transaction* described in Varona's immunized statement where the government indicted Hechavarria on the basis of that statement and secured a plea agreement in which Hechavarria agreed to testify at Varona's trial.

Finally, I would hold only that the government's orchestrated *strategy* of securing Hechavarria's indictment, having him plead guilty, and then introducing his testimony at Varona's trial constituted the use of Varona's information against her. I do not suggest that the proffer agreement would have barred Hechavarria's testimony if he had been tried together with Varona and if he had inculpated her while testifying in his own defense at trial. *But cf. United States v. Byrd,* 765 F.2d 1524, 1532 n. 11 (11th Cir.1985) ("We also strongly suggest that an immunized witness never be tried with those whom he

II.

Because in my view the government violated Varona's proffer agreement when it introduced Hechavarria's trial testimony against her, I turn to the question of whether the government had a legitimate and wholly independent source for Hechavarria's trial testimony.[10] The grand jury named Hechavarria in the superseding indictment based solely on the testimony of Agent Lucas, who related the contents of the immunized statements of Varona and Jose.[11] Absent Varona's immunized statement, the government had no independent means of securing Hechavarria's indictment and thus had no independent means of obtaining his testimony. As the government itself admits in its brief on appeal, "It was critical for the government to use Varona's statement against Hechavarria because without that statement there would not have been a basis for indicting him for possession."[12] Moreover, Jose's debriefing statement, which also named Hechavarria, does not constitute an independent source for Hechavarria's indictment and subsequent testimony because Varona's prior

has implicated.").

[10]The government bears the affirmative burden of establishing that its evidence was not tainted by a defendant's immunized statement; this is done "by establishing the existence of an independent, legitimate source for the disputed evidence." *United States v. Schmidgall,* 25 F.3d 1523, 1528 (11th Cir.1994) (citing *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665); *United States v. Hampton,* 775 F.2d 1479, 1485 (11th Cir.1985) (citing *United States v. Seiffert,* 501 F.2d 974, 982 (5th Cir.1974)). To establish a "wholly independent" source for its evidence, *see Schmidgall,* 25 F.3d at 1528 (quoting *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665), the government must demonstrate that each step of the investigative chain through which the evidence was obtained was untainted, *see Schmidgall,* 25 F.3d at 1528 (citing *Hampton,* 775 F.2d 1479 at 1489).

[11]*See* Gov. Ex. 52 at 2-7.

[12]Br. of the U.S. at 19. *Cf. Hampton,* 775 F.2d at 1488-89 (holding that government violated transactional immunity when it used testimony of immunized witness to build case against co-conspirator, who consequently struck a plea bargain with prosecutors and agreed to testify before grand jury against the immunized witness; stating that "government made absolutely no attempt to establish that the testimony of [the co-conspirator] was obtained independently of [the witness's] immunized testimony").

debriefing statement may have shaped Jose's questioning. *See United States v. Schmidgall,* 25 F.3d 1523, 1530-31 (11th Cir.1994) (holding that the government failed to carry burden of proving an independent source of immunized statements where such statements may have been used to shape the questioning of proffered alternative sources of information).

My analysis would be different if, *prior* to Varona's statement, Hechavarria had been indicted and had pleaded guilty. Under those circumstances, the government presumably would have had a legitimate and wholly independent source for its evidence, and Varona could not have used her debriefing statement to protect herself from Hechavarria's trial testimony. Here, however, the government obviously had no independent source for Hechavarria's trial testimony. I thus conclude that the district court erred in allowing Hechavarria to testify about the same transaction described in Varona's statement.

### III.

Having determined that the admission of Hechavarria's testimony was erroneous, I address the majority's contention that, even if Varona has demonstrated error, the error was not "plain error." Because Varona's counsel failed to object to Hechavarria's testimony at trial, Varona must demonstrate on appeal that: (1) the error was plain, clear, or obvious; and (2) the error affected substantial rights, in that it was prejudicial and not harmless. *See United States v. Olano,* 507 U.S. 725, 732-735, 113 S.Ct. 1770, 1777-78, 123 L.Ed.2d 508 (1993); *United States v. Foree,* 43 F.3d 1572, 1577-78 (11th Cir.1995); *see also* Fed.R.Crim.P. 52(b).[13] I believe that Varona has met both of these requirements.

### A.

---

[13]It "is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Foree,* 43 F.3d at 1578 (citing *Olano,* 507 U.S. at 734, 113 S.Ct. at 1778).

The majority asserts that "when two of the three judges who address a matter conclude that there is no error at all, that must mean there is no plain error." I respectfully disagree. In my view, the majority's interpretation of Varona's proffer agreement impermissibly deems two of the agreement's provisions to be in conflict and renders meaningless the term "information" in Paragraph 3. Because I do not agree with my esteemed colleagues' interpretation of the agreement, their conclusion does not convince me that the district court's error was any less obvious.[14]

Moreover, even if the majority's interpretation were a legitimate alternative to the one I posit, that would only indicate that the agreement's *language* was ambiguous. The agreement's *legal significance* nonetheless would be clear: the agreement barred the government from acting as it did in this case. Where the language of an immunity agreement is ambiguous, the agreement must be interpreted according to the defendant's reasonable understanding at the time she entered into it. *See In re Arnett,* 804 F.2d 1200, 1202-03 (11th Cir.1986) (interpreting plea agreement according to defendant's reasonable understanding at time of plea); *Rowe v. Griffin,* 676 F.2d 524, 528 (11th Cir.1982) (interpreting immunity agreements pursuant to principles applied to interpretation of plea agreements).[15] Indeed, any ambiguity in the promise of immunity must be resolved in favor of the

_____

[14]Plain error review is appropriate in this case because the district court, at the time of Hechavarria's testimony, was aware of all of the relevant circumstances, including the language of Varona's proffer agreement, the contents of her debriefing statement, and the government's use of her statement to indict Hechavarria. On March 13, 1995, several days before Hechavarria's testimony on March 16, Varona's counsel presented these matters to the court in connection with Varona's motion to dismiss the superseding indictment. *See* R4: 192-205.

[15]*Cf. United States v. $87,118.00 in U.S. Currency,* 95 F.3d 511, 517 (7th Cir.1996) (stating that, when interpreting proffer agreements, ordinary contract principles should be supplemented with concern that the bargaining process not violate the defendant's rights to fundamental fairness under the Due Process Clause) (citation omitted); *United States v. Plummer,* 941 F.2d 799, 804 (9th Cir.1991) (stating that ambiguity in an immunity agreement with two contradictory, yet reasonable, interpretations should be "resolved against the one who drafted the language").

defendant. *Id.* at 526 n. 4. I find it obvious that Varona reasonably would have believed that the agreement barred the government from using her statement to obtain Hechavarria's testimony about the same transaction described in her statement. She reasonably would not have assumed that Paragraph 3's prohibition on using "information" that she provided against her was completely trumped by Paragraph 4, which allowed the indirect pursuit of "investigatory leads" and use of "derivative evidence."

According to the majority, the fact that Varona's counsel failed to object to Hechavarria's testimony demonstrated that the government did not plainly violate Varona's proffer agreement. Plain error, however, may occur even when the defense counsel fails to object to the government's violation of an immunity agreement. *See United States v. Fant,* 974 F.2d 559, 564-65 (4th Cir.1992) (vacating sentence and remanding where use of defendant's immunized statements for purposes of sentence enhancement constituted plain error); *United States v. Brimberry,* 744 F.2d 580, 587 (7th Cir.1984) (remanding for evidentiary hearing where trial court committed plain error in failing to determine, *sua sponte,* whether government's prosecution violated the immunity provision of the defendant's plea agreement). The fact that Varona's counsel was present when she signed the proffer agreement does not render the district court's error any less plain. *Cf. United States v. McQueen,* 108 F.3d 64, 66 (4th Cir.1997) (vacating sentence for plain error where government, without objection, violated terms of plea agreement during sentencing); *United States v. Goldfaden,* 959 F.2d 1324, 1327 (5th Cir.1992) (same).[16]

_____

[16]Furthermore, Varona's counsel had almost no warning concerning the content of Hechavarria's testimony. Hechavarria signed his plea agreement with the government on March 15, 1995, the third day of the trial and only the day before he testified against Pielago and Varona. *See* Plea Agreement of Carlos Hechavarria, Gov. Ex. 42, at 5. At the end of the day on March 15, Varona's counsel told the court, "[F]rankly, I haven't the vaguest idea what this man [Hechavarria] is going to testify to." R5: 390. The government eventually delivered to Varona's counsel a one-page, handwritten note about the government's debriefing of Hechavarria, *see* R5:

B.

The final element of the plain error inquiry is whether Varona has met her burden of proving that the error was not harmless. *See Olano,* 507 U.S. at 734-35, 113 S.Ct. at 1777-78. Admitting Hechavarria's testimony against Varona was harmless error only if this court is "persuaded beyond a reasonable doubt that the jury would have reached the same verdict even without consideration of the tainted evidence." *United States v. Nanni,* 59 F.3d 1425, 1433 (2d Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 576, 133 L.Ed.2d 499 (1995). I believe that Varona has proven beyond dispute that there is at least a reasonable doubt that the jury would not have convicted her absent Hechavarria's testimony.

To convict Varona of conspiracy to possess cocaine with intent to distribute it, the jury had to find beyond a reasonable doubt that: 1) a conspiracy existed; 2) the defendant knew of the essential elements of the conspiracy; and 3) the defendant voluntarily and knowingly participated in the conspiracy. *United States v. Harris,* 20 F.3d 445, 452 (11th Cir.), *cert. denied,* 513 U.S. 967, 115 S.Ct. 434, 130 L.Ed.2d 346 (1994). "At a minimum, the defendant must willfully associate himself in some way with the criminal venture and willfully participate in it as he would in something he wished to bring about." *United States v. Newton,* 44 F.3d 913, 922 (11th Cir.1994), --- U.S. ----, 116 S.Ct. 161, 133 L.Ed.2d 104 (1995). Moreover, the defendant must have "a deliberate, knowing, and specific intent to join the conspiracy." *Harris,* 20 F.3d at 452 (citation omitted).

A defendant's participation in a conspiracy "need not be proven by direct evidence. That [he] had a common purpose and plan with the other conspirators may be inferred from a "development

---

391; R6: 437, and then, during the morning of March 16, the government put Hechavarria on the stand to testify against Pielago and Varona, *see* R6: 445. These circumstances do not excuse the defense counsel's failure to object to Hechavarria's testimony about Varona's delivery of cocaine. Nonetheless, the defense counsel's error hardly demonstrates that the government "was within its rights," as the majority suggests.

and collocation of circumstances.'" *United States v. Lyons,* 53 F.3d 1198, 1201 (11th Cir.) (citation omitted), *cert. denied,* --- U.S. ----, 116 S.Ct. 262, 133 L.Ed.2d 185 (1995). Where the government's case is circumstantial, however, "reasonable inferences, and not mere speculation, must support the jury's verdict." *United States v. Perez-Tosta,* 36 F.3d 1552, 1557 (11th Cir.1994), *cert. denied,* 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995). For example, mere speculation as to the interpretations of words used by the defendant is insufficient evidence to link the defendant to a conspiracy. *See United States v. Young,* 39 F.3d 1561, 1565-66 (11th Cir.1994). Similarly, a defendant's association with conspirators and her knowledge of the conspirators' actions are not themselves sufficient proof of participation in a conspiracy. *See United States v. Calderon,* 127 F.3d 1314, 1326 (11th Cir.1997)(stating that repeated presence at scene of drug trafficking, though probative, is not by itself sufficient evidence to support a conspiracy conviction); *Lyons,* 53 F.3d at 1201 (holding that "[m]ere presence, guilty knowledge, even sympathetic observation have all been held by this court to fall short of the proof required to support" a conviction for "conspiracy to possess and distribute drugs"). This court repeatedly has relied upon these principles in reversing conspiracy convictions for insufficiency of evidence.[17]

Even though the government introduced surveillance and wiretap evidence at trial, Hechavarria's testimony was the *only* evidence indicating Varona's knowing participation in a

---

[17]*See, e.g., United States v. Thomas,* 8 F.3d 1552, 1556, 1558 (11th Cir.1993) (holding that evidence that the defendant knew of planned bank robbery did not prove that he participated in conspiracy); *United States v. Villegas,* 911 F.2d 623, 631 (11th Cir.1990) (stating that the defendant's looking left and right in the vicinity of his brother's cocaine deal was insufficient to show participation in the conspiracy), *cert. denied,* 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991); *United States v. Hernandez,* 896 F.2d 513, 519-20 (11th Cir.) (holding that the defendant's association with the co-defendant was insufficient to prove conspiracy or possession even though the defendant was in vehicle from which drugs were retrieved and was present when drugs were given to an undercover agent), *cert. denied,* 498 U.S. 858, 111 S.Ct. 159, 112 L.Ed.2d 125 (1990).

conspiracy to possess cocaine with intent to distribute it. Prior to her husband's arrest on the evening of November 6, 1993, only one telephone call involving Varona was intercepted; on October 20, 1993, Varona merely answered the phone and gave it to Jose.[18] The government witness monitoring Frank Novaton's phone on November 6 stated that he intercepted calls between the Varona phone and the Novaton phone concerning an eight kilogram cocaine transaction, but he specifically stated that none of those calls involved Varona.[19] Similarly, the government presented no inculpatory surveillance evidence gathered prior to Jose's arrest. Agent Lucas testified only that Varona and two children arrived at the house in the evening of November 6 after Jose and Pielago had entered with the cocaine.[20] He did not suggest that Varona participated in any way in obtaining the cocaine, nor did he testify that Varona assisted Jose and Pielago in readying the cocaine for transport.

Other evidence concerning Varona consisted of phone calls intercepted *after* Jose was arrested. Viewed in the light most favorable to the government, these phone calls suggest only that Varona knew that Jose had cocaine with him when he left the Varona residence on the evening of November 6 and that she knew where he was going. Such evidence, standing alone, failed to establish that Varona knowingly participated in a conspiracy. *See Lyons,* 53 F.3d at 1201. Notably,

---

[18]R4: 31 (testimony of Detective Morejon). Another government witness testified that part of a telephone call intercepted on November 6, 1993, involved Hechavarria and Varona talking about "telemedia cable." R4: 128-29 (testimony of Detective Diaz). The witness specifically stated that he was not suggesting that the discussion of cable television was a coded conversation about cocaine. R4: 129. Varona's voice also was heard in the background during an intercepted phone call between Jose and Hechavarria on November 6, 1993. She apparently was shouting at her children. R4: 104-05 (testimony of Detective Marrero); Gov. Ex. 11B.

[19]R5: 318-21 (testimony of Sergeant Martinez).

[20]R4: 170 (testimony of Agent Lucas). The evidence did not demonstrate that Varona actually met with Jose and Pielago, but rather only that she arrived at the house while they were there. R5: 246 (testimony of Agent Lucas).

no evidence indicated that an extra kilogram of cocaine[21] remained in the Varona residence after Jose and Pielago left, much less that Varona *knew* about the kilogram or *gave* the kilogram to anyone.

Only by introducing Hechavarria's testimony about Varona's delivery of cocaine did the government present sufficient evidence to convince a jury beyond a reasonable doubt that Varona knowingly participated in a conspiracy to possess cocaine with intent to distribute it. Hechavarria testified that Varona called him after her husband's arrest and asked him to go by her house; when he arrived, Varona gave him a gray tool box that contained a kilogram of cocaine.[22] Hechavarria's testimony was not refuted, nor was it effectively challenged on cross-examination.

Apart from Hechavarria's testimony about Varona's delivery of cocaine, the government did not even present a *prima facie* case of conspiracy against Varona. Under the plain error rule, Varona has met her burden of proving that there is at least a reasonable doubt that the jury would not have convicted her absent Hechavarria's testimony about the transaction. *See Olano,* 507 U.S. at 734-35, 113 S.Ct. at 1777-78; *see also Nanni,* 59 F.3d at 1433.[23]

---

[21]Absent Hechavarria's testimony, the trial evidence does not even demonstrate that an extra kilogram of cocaine existed. The crucial government witness on this issue contradicted himself regarding whether Jose had obtained eight or nine kilograms of cocaine prior to his arrest with eight kilograms. *Compare* R5: 318-21 (testimony of Sergeant Martinez) (stating that intercepted phone calls between the Varona phone and the Novaton phone on November 6 established that there was activity in relation to the delivery of *eight* kilograms of cocaine) *with* R5: 329 (testimony of Sergeant Martinez) (stating that he "knew from what was going on during the investigation" that Jose had picked up *nine* kilograms of cocaine).

[22]R6: 456-57.

[23]Even with Hechavarria's testimony, the jury had a difficult time reaching a guilty verdict against Varona. After one day of deliberations, the jury reached a verdict regarding Pielago, but it advised the court that it was unable to reach a verdict as to Varona. The district judge then gave the jury a modified *Allen* charge. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Following an additional day of deliberations, the jury submitted a note announcing that it was hopelessly deadlocked as to Varona. Upon being summoned to announce

IV.

Even in a case involving plain error, "the Courts of Appeals should correct such error[ ] only when [it] "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *United States v. Foree,* 43 F.3d 1572, 1578 (11th Cir.1995) (citing *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993) (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936))). I believe that the government's violation of Varona's proffer agreement is sufficiently troubling to merit correction on appeal.

First, strict enforcement of immunity agreements protects central values of the judicial system, namely defendants' right to due process and their right against self-incrimination. *See United States v. Harvey,* 869 F.2d 1439, 1444 (11th Cir.1989) ("Due process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes."); *Rowe v. Griffin,* 676 F.2d 524, 528 (11th Cir.1982) ("When such a promise [of immunity] induces a defendant to waive his fifth amendment rights by testifying at the trial of his confederates or to otherwise cooperate with the government to his detriment, due process requires that the prosecutor's promise be fulfilled."); *United States v. Weiss,* 599 F.2d 730, 737 (5th Cir.1979) ("To protect the voluntariness of a waiver of fifth amendment rights, where a plea, confession, or admission is based on a promise of a plea bargain or immunity, the government must keep its promise."); *cf. United States v. $87,118.00 in U.S. Currency,* 95 F.3d 511, 517 (7th Cir.1996) (stating that immunity provisions of proffer agreements must be interpreted to ensure "that the bargaining process not violate the defendant's rights to fundamental fairness under the Due Process Clause") (quotation

---

its verdict as to Pielago, however, the jury found Varona guilty of conspiracy. Although this sequence of events does not reveal the precise nature of the jury's deliberations on the conspiracy charge, courts in other cases have reasoned that an error was less likely to have been harmless where an *Allen* charge was necessary. *See, e.g., United States v. Shavers,* 615 F.2d 266, 269 (5th Cir.1980); *Mason v. Scully,* 16 F.3d 38, 45 (2d Cir.1994).

omitted).   Second, allowing the government to violate immunity agreements without any consequence seriously undermines the public reputation of the fairness of the judicial system.  Third, failure to enforce the terms of immunity agreements renders such agreements significantly less attractive to witnesses and thus weakens an important law enforcement tool.

As the majority notes, the plain error rule is a narrow exception to the contemporaneous objection rule.  Nonetheless, plain error review must be available to remedy palpable injustice.  The Supreme Court has explained that Fed.R.Crim.P. 52(b), the plain error rule,

> was intended to afford a means for the prompt redress of miscarriages of justice.... The Rule thus reflects a careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly addressed.

*United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982).  In my view, convicting Varona solely on the basis of evidence obtained in violation of her proffer agreement is just the sort of injustice for which plain error review is appropriate.

Moreover, I disagree with the majority's implication that reversal for plain error is limited to cases involving an intervening change in law or a violation of specific procedural rules, such as Fed.R.Crim.P. 11.  In one of the very cases cited by the majority, this court reversed the defendant's conviction solely on the grounds that certain testimony, to which the defense failed to object, was unduly prejudicial.  *See United States v. Sorondo,* 845 F.2d 945 (11th Cir.1988) (reversing conviction because admission of DEA agent's testimony about informant's record in assisting other successful prosecutions was plain error).  Indeed, this court has ruled that a variety of different types of error are plain error requiring reversal.[24]  The prosecution's prejudicial violation of an immunity

---

[24]*See, e.g., United States v. Banks,* 942 F.2d 1576, 1579-81 (11th Cir.1991) (reversing for plain error where jury instruction was inadequate to permit jury to give proper consideration to proffered defense); *United States v. Singleterry,* 646 F.2d 1014, 1018-19 (5th Cir. Unit A June 1981) (reversing for plain error where prosecutor asked defendant whether he associated with

agreement can be reversible plain error, as well. *Cf. United States v. Fant,* 974 F.2d 559, 564-65 (4th Cir.1992) (vacating sentence and remanding where use of defendant's immunized statements for purposes of sentence enhancement constituted plain error); *United States v. Brimberry,* 744 F.2d 580, 587 (7th Cir.1984) (remanding for evidentiary hearing where trial court committed plain error in failing to determine, *sua sponte,* whether government's prosecution violated the immunity provision of the defendant's plea agreement).

In light of the overwhelming importance of Hechavarria's testimony to the government's case against Varona, I find the majority's invocation of the "sandbagging" threat to be unpersuasive. Varona's counsel had nothing whatsoever to gain by failing to object to Hechavarria's testimony at trial, but if he had objected and the objection had been sustained, the government's case against Varona almost certainly would have failed. This case, therefore, hardly is one in which a defense lawyer "intentionally decline[d] to object to a potentially unconstitutional trial procedure in order to inject reversible error into the proceeding." *United States v. Joshi,* 896 F.2d 1303, 1307 n. 3 (11th Cir.), *cert. denied,* 498 U.S. 986, 111 S.Ct. 523, 112 L.Ed.2d 534 (1990).

In my view, the record unequivocally indicates that Hechavarria's testimony was obtained in violation of Varona's proffer agreement. The record also indicates that the government had no legitimate and wholly independent source for Hechavarria's testimony and that no reasonable jury could have convicted Varona absent his testimony. I therefore would reverse Varona's conviction

---

convicted felons); *United States v. Darland,* 626 F.2d 1235, 1237-38 (5th Cir.1980) (reversing for plain error where judge excluded evidence concerning defendant's reputation for honesty, integrity, and peacefulness); *United States v. Thompson,* 615 F.2d 329, 332-333 (5th Cir.1980) (reversing for plain error where judge dismissed government witness and instructed jury to disregard her surprise adverse testimony); *United States v. Garza,* 608 F.2d 659, 663-66 (5th Cir.1979)(reversing for plain error where prosecutor vouched for government witnesses and stated that government had no interest in convicting the wrong person).

and remand her case for a new trial.[25]

Accordingly, although I CONCUR with Parts IV.A and IV.C of the majority opinion, I respectfully DISSENT as to Part IV.B.

---

[25]Under these circumstances, I see no need for the district court to conduct either an evidentiary hearing pursuant to *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), or a harmless error inquiry. *See United States v. Schmidgall,* 25 F.3d 1523, 1531 n. 10 (11th Cir.1994) (reviewing cases involving use of immunized testimony and concluding that "[i]n every case ordering outright reversal, the opinion indicated that there was a clear use of immunized testimony and that further proceedings would be futile").